## PURINGTON v. BROUGHTON.

(Court of Civil Appeals of Texas. El Paso. May 1, 1913. Rehearing Denied June 5, 1913.)

1. COUNTIES (§ 191*)—TAXATION—LEVY—ORDER—VALIDITY.

An order of the commissioners' court of a county reciting that it is ordered by the court that the rate of taxation for a year for the county "be and is as follows," followed by a tax rate for various purposes, does not levy a tax within the statute.

[Ed. Note.—For other cases, see Counties, Cent. Dig. §§ 300, 305; Dec. Dig. § 191.*]

2. TAXATION (§ 734*)—TAX SALES—VALIDITY.

A legal levy of taxes for which a sale is made must be shown or a tax sale is invalid, and the tax deed is no evidence of title.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 1408, 1470–1473; Dec. Dig. § 734.*]

3. EXECUTORS AND ADMINISTRATORS (§ 444*)—RIGHT OF EXECUTOR TO RECOVER REAL ESTATE—PLEA IN ABATEMENT.

The right of an executor to sue and recover property of the estate may only be questioned under a plea in abatement.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 1813–1817, 1837–1841; Dec. Dig. § 444.*]

4. EXECUTORS AND ADMINISTRATORS (§ 7*)—RIGHT TO RECOVER REAL ESTATE—ACTIONS—EVIDENCE.

Where, in trespass to try title by an independent executor, the record of probate proceedings showing the appointment and qualification of the executor was introduced in evidence, and there was nothing to show that the estate had been wound up by an order of the probate court, it will be presumed that the executor

was acting executor, and as such could maintain the suit.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig §§ 19, 20; Dec. Dig. § 7.*]

5. ADVERSE POSSESSION (§ 13*)—ELEMENTS—EVIDENCE—SUFFICIENCY.

Where defendant in trespass to try title begun October 31, 1908, relied on adverse possession, he must show that he had adverse possession prior to October 31, 1903, and where there was no evidence that the premises were fenced prior to that time, and the proof showed that the possession since that time through tenants was not continuous and exclusive, a verdict for plaintiff showing legal title was properly directed.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 65, 67–76; Dec. Dig. § 13.*]

Appeal from District Court, Pecos County; W. C. Douglas, Judge.

Action by John Broughton, independent executor of James P. Douglas, deceased, against Mary L. Purington. From a judgment for plaintiff, defendant appeals. Affirmed.

W. C. Jackson, of Ft. Stockton, for appellant. Carlton, Townes & Townes, of Houston, O. W. Williams, of Ft. Stockton, and John Broughton, of Houston, for appellee.

HARPER, C. J. Appellee, John Broughton, independent executor of the estate of James P. Douglas, deceased, filed this suit in the district court of Pecos county in trespass to try title to a section of land described in the petition against J. H. Nations and Mary L. Purington. Nations entered his disclaimer. Appellant filed her answer, containing general demurrer, plea of not guilty, and plead the three, five, and ten years statutes of limitation.

The appellee instituted this suit on October 31, 1908, to recover the land in controversy in his capacity as independent executor of the estate of Jas P. Douglas, deceased. As evidence of his right to recover he introduced in evidence patent from the state of Texas to Jas. P. Douglas, deceased, to the land in controversy. Appellee also introduced certified copy of an order from the probate records of Smith county, Texas, admitting the will of Jas. P. Douglas, deceased, to probate, and the appointment of appellee independent executor of said estate. The appellee also introduced in evidence certificate from the county clerk of Smith county, Tex., showing that appellee duly qualified as such independent executor on the 31st day of October, 1902. The appellant, Mary L. Purington, introduced in evidence a deed from Jno. Edgar, tax collector of Pecos county, Tex., to G. A. Purington for the land in controversy, dated July 17, 1885, which was filed for record in Pecos county, Tex., September 3, 1888. The appellant also testified by deposition that she was the surviving wife of G. A. Purington, deceased, and introduced evidence to show the payment of taxes on the section of land in controversy for a number of years prior to the institution of this suit.

In Dawson v. Ward, 71 Tex. 75, 9 S. W. 107, is held: "Our courts have determined that from the tax deed no presumptions are drawn that the requisite proceedings upon which the power to sell follows have been taken by the officers charged with the duty of levying the taxes, assessing the property and making the collections. That the deed of the collector without proof of the compliance with all the requirements of the law necessary to call into exercise his authority to make the sale, is no evidence of title in the party claiming under it is no longer an open question." Clayton v. Rehm, 67 Tex. 54, 2 S. W. 45.

[1] The following order of the commissioners' court of Pecos county, Tex., was offered as proof that the commissioners' court complied with their duty under the statute to levy the tax: "On this the 11th day of August, 1884, it is ordered by the court that the rate of taxation for the year 1884 for Pecos county, Texas, be and is as follows, to wit: County ad valorem tax, 15 cents on each $100.00 worth of taxable property. Courthouse and jail tax, 20 cents on each $100.00 taxable property." This order does not in terms levy the tax, and it is impossible to interpret the words used as having that effect.

[2] A legal levy of taxes for which sale was made must be shown or a tax sale is without authority, and the deed is no evidence of title; and for the reason that there is no evidence of compliance with other statutory provisions which are essential to a valid tax deed the deed offered in evidence did not convey title.

[3] The fourth assignment of error charges error because the evidence show that the plaintiff had no right to sue for or recover the land. An executor's right to sue and recover property belonging to the estate can only be questioned under a plea in abatement. Fischer v. Giddings, 43 Tex. Civ. App. 393, 95 S. W. 33.

[4] And in the instant case the record of probate proceedings showing the appointment and qualification of executor, and no evidence appearing that the estate had been wound up by an order of the probate court, it will be presumed that appellee is still acting executor of the estate and as such has authority to bring the suit.

[5] The other assignments raise the question, in different ways, that the court erred in instructing the jury for appellee when it should have been submitted upon the plea of limitation. The appellant, Mrs. M. L. Purington, was a nonresident of the state of Texas at the date of the institution of this suit, and had been for many years prior

thereto. She sought to show possession to the lands in controversy through R. B. Neighbors and J. H. Nations, who were alleged to be her tenants. At the date of the institution of the suit, the section of land in controversy was in the pasture of J. H. Nations, and it seems that J. H. Nations purchased the ranch and cattle interest of R. B. Neighbors. The premises involved were located in which is known as the Lemons Tank pasture at the date of the institution of this suit. The tract of land was not in the Neighbors pasture at the time it was first inclosed, but the fences were at some subsequent date rearranged in such manner as to bring it within its boundaries. According to the testimony of Lee Serna, the Lemons tank pasture, which seems to have been a subdivision of the R. B. Neighbors pasture, contained about 22 sections, which were under the control of R. B. Neighbors; and according to the testimony of H. M. Patterson, the foreman of the J. H. Nations ranch, the section of land in controversy at the time J. H. Nations acquired the property was in a pasture containing more than 65,000 acres of land. Relying upon the possession of R. B. Neighbors and J. H. Nations, who appellant claims were her tenants, the appellant introduced the testimony of Lee Serna and J. L. Moore to show the nature and character of the appellant's occupancy of the premises in controversy.

The witness Lee Serna testified as follows: "I lived in Pecos county from the spring of 1897 to 1898 and went to work for R. B. Neighbors on his ranch about 40 miles south of Ft. Stockton in Pecos county, and worked for him continuously until January after his death. I think he died in November or December, 1904. I am acquainted with the Lemon Tank pasture in Pecos county, Tex. Don't remember when it was fenced, but know it was fenced after I worked for Mr. Neighbors. Mr. Neighbors ordered the pasture fenced and had control of the pasture after it was fenced. We used the pasture principally for steer cattle. I know where the southeast corner of the Lockwood or E. L. pasture is in Pecos county. I constructed a fence there from near the southeast corner of the E. L. pasture east of the J. C. Smith pasture. It is about three miles from the southeast corner of the E. L. Lockwood pasture. I do not remember when the fence was built. This fence inclosed what is known as the Lemons Tank pasture in Pecos county. I removed from Pecos county about seven years ago in January after R. B. Neighbors died. I went to work for Neighbors either in the spring of 1897 or 1898. The R. B. Neighbors ranch in Pecos county was located about 40 miles south of Ft. Stockton. The ranch on the west side was all open. The Lemons Tank pasture was fenced by joining with Lockwood and Smith fences. The Lemons Tank pasture was fenc-

ed by joining other fences. I am not positive whether or not Neighbors owned all the land inclosed in the Lemons Tank pasture or not. I know that he owned some, and that he did not own other lands. Private parties may have owned lands in said pasture, but will not be positive about it. There was school land in the pasture—do not know whether he had it leased or not. It was my impression that he had control over all the land in said pasture. I do not know whether Neighbors inclosed the land that he did not own as he attended to the lands himself. I was foreman of the ranch. There was 20 odd sections inclosed in this pasture, but do not remember the exact number. Don't know how many acres. I don't know who owned the E. L. Lockwood pasture; don't know who owned the Smith pasture; don't know the size of the pasture; don't know who owned the land lying between these two pastures; know 'that Neighbors owned some. The map shows school lands and whether or not it was all sold I cannot say. I was in the employ of Neighbors when he died—do not know how long it was after his death until J. H. Nations took possession of the Lemons Tank pasture."

The witness Moore on direct examination testified as follows: "I am tax assessor of Pecos county. Have held the office for 11 years. I was acquainted with R. B. Neighbors in his lifetime. I was acquainted with the. ranch he owned in Pecos county. In January, 1905, I took charge of that ranch after his death. I was sent out there to take charge of this and sell it and the cattle out of the estate. I took charge January 1, 1905. I am acquainted with what is known as the Lemons Tank pasture. I knew it when I took charge of the Neighbors pasture. Section 1, block 110½, S. A. & M. G. Ry. Co., was located in the southwest corner of the Lemons Tank pasture at the time I took charge of the Neighbors ranch. There was something like 20 sections in the Lemons Tank pasture. I don't know exactly when that pasture was fenced. I was in the habit of passing down through that country before 1905, and saw that fence and knew that the Lemons Tank pasture was fenced. I am positive that it was there in 1904, and think it was fenced in 1903. I would not be right positive, but I know it was there in 1904, because I passed there two or three times through that pasture and I think it was there in 1903, and at that time there was about 20 sections of land in the pasture. Neighbors used it mostly for a beef pasture. He hardly ever kept any stock cattle in it; usually kept his steers in it and used it exclusively." On cross-examination he testified: "The fence that fences the Lemons Tank pasture joins onto the southeast corner of the Lockwood pasture and runs due east and joins the Smith pasture. That was the Smith pasture in 1905. When the Smith

pasture was first fenced, it did not go as far south as it does now, and it was afterwards extended south so as to take in another block. Lemons Tank is on section 4, block 2, and is about three miles north of the southeast corner of the Lockwood pasture, and about the same distance north of section 1, block 110½. I remember the old fence which crossed between the Lockwood pasture and the old south fence as first put in. It run right by the Lemons Tank and did not include section 1, block 110½. Q. You did not know that the fence at the southeast corner of the Lockwood pasture running east so as to take this section 1 in block 110½ into the Lemons Tank pasture—you did not know that this was there before the year 1904, do you? A. No, sir; I went by this place twice. I don't know just when that fence was moved south. It was there, though, in 1904. In January, 1905, I am positive of it. When I went to the ranch, January, 1905, there was no partition fence between Neighbors ranch and Moss ranch. Moss was running cattle in the west end of the same ranch. That had been going on for some little time. Moss' cattle run over into Neighbors' range and Neighbors' cattle over into Moss' range. There was a man by the name of Barnes on the southwest corner of same inclosure with a well and bunch of sheep. Section 1, block 110½, was supposed to be right in the corner of the Lemons Tank pasture against the fence. I was never with a surveyor who run out the line. I don't know whether the fence is right on the line or not. It was supposed to be right on the south line of the survey. I never surveyed it out, though, to see where the line was. The fence from Lockwood ranch to Smith ranch running somewhere about the south line of section 1, block 110½, was there when I went there in 1905. That section was included or inclosed on all sides by other lands." On redirect examination he testified: "There was a fence on the south supposed to be on the south line, and the fence on the west, the Lockwood pasture, which fenced two sides. Moss nor any of the parties mentioned as being in the pasture with Neighbors did not pasture stock in the Lemons Tank pasture. They had nothing to do with it. It was controlled exclusively by Neighbors. There was no partition fence between the Neighbors ranch and Moss. Just the Lemons Tank pasture fenced off by Neighbors. When I went down there in January, 1905, the fence on the south side of Lemons Tank pasture the wire was knocked off and tied down to the bottom for 200 or 300 yards so cattle could pass backwards and forwards. I think it had been that way all winter. I am not sure. In about 1 or 1½ months after I went there I put this fence back up. I put it up before Mr. Patterson came out there. Don't know how long it had been down before I went there. That was just temporary. There was

not very much water on that end of the range and the Lemons Tank had plenty of water in it, and they knocked the wire off the posts and tied them down to the ground so the cattle could go in and water. When the cattle would water and pass out over the fence where it was tied down, they would pass into the pasture where Moss also had cattle ranging, and in which Barnes was located in the southwest corner of same. There was 50,000 or 60,000 acres or more in that pasture. I think there was something like a 100 or 125 sections in it. It was bounded on the north by the Lockwood pasture fence and extended along the south fence of Lockwood's pasture for 20 miles or more back into the mountains without any fence to fence it off from the surrounding country. Joe Irving's was the next fence west, something like 20 miles from the Lemons Tank, and stretched over to what was called the old W. B. pasture on the south, being about 20 miles east and west by from 5 to 15 miles north and south. It was all open country south of Lockwood's pasture as far west as Irving's; part of that territory was occupied by Moss with cattle, and Barnes in southwest corner of Moss. I don't believe there was anyone else in there. I do not know of my own knowledge whether or not the taking the fence down so the cattle could go to the Lemons Tank for water was temporary or not. I was guessing at that. Do not know how long the fence had been down, nor for what purpose it was left down. There was no trouble for cattle, horses, or any stock to pass over it. A wagon could pass over it. It was flat on the ground. The stock of both Neighbors and Moss passed over the fence and watered at this tank. They were all mixed up together, and we did not try to keep them separate. When we gathered the cattle, we got about as many of the Moss cattle as we did of the Neighbors cattle."

On being recalled, J. L. Moore testified as follows: "I have lived in this county about 15 years. The rental value of lands like the land in controversy is about 4 cents per acre per annum. The fence I spoke of being down on the south side of the Lemon Tank pasture was not on this section of land in controversy. It was, I think, more than a mile from the corner of the fence. It might not have been over a mile. There is a little strip as well as I remember between it and the Lockwood fence, a quarter to a half mile wide; lays between the section of land in controversy and the Lockwood fence. Before the fence was moved from the Lemons Tank south to where it was located in 1905, when I went there, this section of land in controversy was in the large pasture used by Neighbors and Moss as hereinbefore described. I do not know when the fence was moved south. It was there though in 1904. The fence was moved

from immediately south of the Lemons Tank to the south side of the section of land in controversy. Before that the land then lay in the pasture which had Moss and some one else ranching. There was no fence immediately below or south of the Lemons Tank when I went there in 1905, until you got to this southeast corner of the Lockwood pasture. I do not remember the year that the J. C. Smith fence was put in there. It was about 1899, though. Q. You know that that fence was moved in 1904 from the Lemons Tank to where it stood in 1905, and I believe you stated this morning that you thought in 1903 it had been moved? A. Yes; it struck me that it was there earlier than that, but I would not be positive, but I was through that pasture two or three different times in 1904, and it was where it now is in 1904, but I am not positive just when it was moved. Q. Your best opinion is that it was there in 1903; your best recollection is that it was there in 1903, is it not? A. Well, it seems to me that it was; I am not positive though, whether it was or not. By Plaintiff: You cannot swear that it was not there? A. No; I passed through that country there usually every year once or twice. Sometimes, though, I would go the other road. J. L. Crawford lived close there and had a better opportunity to know when it was moved than I had."

J. L. Moore, being recalled, stated: "I have no date that I can refer to further back than 1904 as to when the fence was there. I am not sure that I went through the pasture in 1903. If this fence was moved in 1903, and I passed there during that year and saw the fence standing where it now does on the south end of the Lemons Tank pasture, it was before May or during that month, 1903, that I saw it."

Appellee instituted this suit October 31, 1908. In order for appellant to recover, it is necessary for her to show that she had adverse possession of the premises in controversy prior to October 31, 1903. There being no evidence that the land was fenced prior to that date; and, the evidence further showing that the possession since that date through her agents or tenants was not continuous and exclusive, the court did not err in instructing a verdict. The judgment of the lower court is therefore affirmed.

McKENZIE, J., did not sit in this case.